## PARKER v. TRUEHEART.    (No. 6855.)

(Court of Civil Appeals of Texas.    San Antonio.    Dec. 20, 1922.)

1. **Injunction** ⊂⊃153 — **Temporary injunction should not be conditional upon action of appellate court.**

An order granting a temporary injunction should be made unconditional without respect to any action the appellate court may take, and it is improper for the court to grant a temporary injunction not operative until after the record has reached the appellate court on motion or on appeal.

2. **Nuisance** ⊂⊃31 — **Temporary injunction against operation of dance hall sustained.**

In a suit to restrain the operation of a dancing pavilion across the street, 90 feet away from complainant's residence, evidence as to noises and disturbances preventing complainant and his family from going to sleep, and as to loss of tenants and reduction of rents, held sufficient to sustain a finding of injury to complainant's property and person, so that a temporary writ of injunction was properly issued.

Appeal from District Court, Bexar County; W. W. Walling, Special Judge.

Suit by Henry M. Trueheart against L. R. Parker to restrain the operation of a dancing pavilion. Temporary injunction was granted, and defendant appeals. Affirmed.

Hugh R. Robertson and Leo Brewer, both of San Antonio, for appellant.
Joseph Ryan, of San Antonio, for appellee.

COBBS, J. This suit was brought by appellee to enjoin appellant from operating a dancing pavilion at the corner of Josephine street and Avenue B, in the city of San Antonio. After hearing the evidence of witnesses, taken on the preliminary hearing, the court entered an order granting the plaintiff's prayer for a temporary injunction, but directing that the enforcement of the order be "suspended until midnight of July 31, 1922, at which time the suspension should automatically cease, unless said suspension should be further continued by the said Court of Civil Appeals or any one of the judges thereof." The temporary injunction was accordingly issued and went into effect on August 1, 1922.

On account of the peculiar phraseology of the order, appellant filed a motion in this court "to enter an order suspending or postponing the taking effect of the temporary injunction or restraining order issued by the

⊂⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

district court." Upon the hearing of said motion the same was denied by this court.

[1] We have been shown no authority where, after the court has granted a temporary injunction, it will be operative only until after the record has reached this court on motion or on appeal. Of course, the trial court may make such necessary orders modifying, granting, or dissolving the injunction that may be necessary, but not of the kind made here. Such orders should be made unconditionally without respect to any action this court may take. A very similar proceeding was before this court and just decided in Gus Genitempo v. William Anderson et al., 245 S. W. 270. For the purposes of this appeal, this case will be treated as though the temporary restraining order had been granted as it was by the court below.

The appellee testified substantially:

"The dance hall owned by Mr. Parker was opened on June 15, 1922. It is situated about 90 feet from his home. He testified also that the first time he met Mr. Parker was about 10 o'clock in the morning. Parker said 'I came over to see about getting your good will about putting up the dance hall right across here.' 'Well,' I says, 'I will tell you, I told Mr. Cain I wasn't going to stand for it before he took the bill boards away, and I tell you now that I am not going to stand for it now. It is entirely too close to my house.' He said, 'Of course, if we can't agree on things, we will put up the hall anyhow.' Then he got mad, and I got mad. I said it is out of the question. I am not going to stand for a dance hall opposite my house. If I have got any recourse I am going to seek it. Then he left, and I never had any more conversations with him. He went ahead and constructed the dance hall, or it was constructed.

"It is about 90 feet from the front of the dance hall to the front of my place; sitting on my front gallery there is very little obstruction to the view of the dance hall. A small palm about five feet or four feet high is the only obstruction. I have a full view of the dance hall from my front gallery. I can see what is going on there. The dance hall is open along the front and along the sides. I can hear the noises in there, and I can see the people. The front of the dance hall has a very large light, about the center of the building and about twelve feet high. I have heard hand clapping in there all the time after they get through playing a piece. A minute or two they applaud, stand on the floor, then the music starts again, then they dance a few minutes, and then they applaud again, and it is pretty much that way all night, outside of the intermission, which lasts about 20 minutes at about 10 o'clock. Every night the music starts at 8 o'clock and lasts until 11:30. On Saturdays and Sundays the crowd is apparently twice as large as it is any other day. I would estimate that on Saturday and Sunday the crowd is somewhere in the neighborhood of 250 people, men and women. Ordinarily I hear about two or three pieces of singing in there at night. The singing is with the music.

"The Idlewild is not running now. It burned Saturday before last about the 18th, three or four days after the new hall started. I could not hear the music from the Idlewild unless a norther was blowing. The music from the Idlewild hall did not bother me. It was too far away. The Idlewild is 300 feet from the north side of Josephine street, and Josephine street is 55 feet from property to property line. The total distance from my house to the Idlewild is 370 feet in all. The distance from my front gallery to Parker's dance hall is 90 feet. My home place cost me approximately $4,500 when I built it 16 years ago. Since then I put in sidewalks and fences and a garage. The reasonable market value of my house now is about $7,500; the reasonable market value of the premises occupied by Mrs. Dibble is about $4,500. The reasonable market value of the apartment house immediately west of my place is from $7,000 to $7,500.

"Mr. Parker has given the name of 'Silver Leaf Social Club' to his dance hall. I don't know whether the club is incorporated or whether anybody belongs to it or whether he is the only member of the club. There is music in the dance hall every night. I have seen boys and girls there I should judge from 14, 16, and 18 years old. There are a few people older than that. They begin coming shortly after 8 o'clock and the biggest crowd is there about 9:30 until quarter of 10. They begin to leave a quarter to 11. Ordinarily I have been going to sleep about 9 to 9:30 before the dance hall was opened. Since the dance hall opened I have not been going to sleep until after they quit and put the lights out. I have been doing that simply because I can't sleep for the noise. I have tried to close my house and shut out the noise but I don't have very much success after 10 o'clock. I have seen girls and women unchaperoned going inside.

"Immediately west of the dance hall is a street 50 feet wide, then a strip of Brackenridge Park, called Avenue B. The strip of Brackenridge Park immediately west of Avenue B has a good deal of brush and weeds on it, and is about 130 foot front.

"I saw crowds of people in front of the dance hall, on the steps every evening, on the lawn and the sidewalk. I have noticed congestion on Josephine street in front of my premises. The first night there was quite a congestion. Since then it has not been so crowded because Josephine street has been closed up by the paving company that is paving the west part of it. The barrier is on River avenue. Josephine street is closed to traffic by the paving company entirely since Monday when they commenced to tear up the asphalt.

"Some of my tenants have threatened to move on account of the location of the dance hall. The people upstairs in the apartment notified me about five days after the hall opened that they were going to move; for me to put out a sign that they were going to move. The reason she gave for wanting to move out of my house was because of the noise of the dance hall opened by Mr. Parker. The noise around there, the loss of sleep, have affected me very considerably. I have not been able to eat a square meal since it started, and I have lost about 10 or 12 pounds. Saturday I saw two drunken people around there and Sunday night one, in front of my house, and in front of the

hall, one disturbance by two drunken soldiers and a civilian in front of my house. I was sitting out there with my wife.

"Since the new hall has been opened, I have been unable to sleep, my family has been kept awake, and my tenants have threatened to leave.

"I slept before that dance hall was there. I could not say that the music is any different than the ordinary dance music they have anywhere in a public hall. My particular objection is to both music and the automobiles, the general noise and surroundings. I reduced the rent because the dance hall was there. Mrs. McGloin, who lived upstairs, told me she was going to move about four or five days after the hall started. She is a married woman. Her husband went away East, and he came back about a week ago. She has not yet moved because she said she could not get the kind of a house she wanted. She said she was going to move on account of the hall. She said she would not live there with the hall in operation. It was after the dance hall opened that she told me that.

"My home is a six room house. I have noticed men and women, boys and girls go in the to the dance hall. I have seen young ladies ordinarily between 16 and 18 and 18 and 20 and I have seen older people. I have seen all ages. I have seen a few go in there who from their appearance were from 14 to 16. I have seen girls 14 or 16 or 18 go in there unchaperoned. Mrs. McGloin told me she would not come here to testify because she simply did not want to get mixed up with it. and she had never been in court in her life. She told me that at the same time she told me she was going to move."

[2] The testimony of other witnesses substantially corroborates this testimony. It is clear that the dance hall tends to do injury to appellee's property and person, and the proof was sufficient to justify the issuance of the temporary writ.

The record sufficiently shows that an irreparable injury will probably be suffered by him before a final hearing, and that the facts will in all probability be established as alleged. That the preliminary injunction will not cause any greater injury to appellant than to operate the nuisance will cause to appellee. The object of the writ is to maintain the status in quo and thereby prevent further or impending injury, but not to determine in such proceedings the final rights of the parties. 22 Cyc. p. 753.

We are of opinion that the trial court did not abuse his discretion in granting the writ which should have been continued in effect until the trial or further orders of the court without any "automatic break-offs."

Of course, we do not mean to say that the trial court did not have the right to enlarge, modify or dissolve, but that was not done, and we treat the order as granting the temporary writ. We hereby affirm the judgment of the trial court in granting the temporary writ of injunction which we here now order to continue in full force and effect until the trial of the case.